**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

Daniel P. Minnick,

        Plaintiff,

        v.                                 Case No. 1:12-CV-265-JVB-RBC

Carolyn W. Colvin,
Acting Commissioner of
Social Security,

        Defendant.

**OPINION AND ORDER**

Plaintiff Daniel P. Minnick seeks judicial review of the final decision of Defendant

Carolyn W. Colvin, Acting Commissioner of Social Security, who denied his application for

Disability Insurance Benefits under the Social Security Act. For the following reasons, the Court

affirms.

**A.  Procedural Background**

In October 2010, Plaintiff applied for Disability Insurance Benefits alleging disability due

to fibromyalgia and emphysema with an onset date of January 30, 2009. (R. at 139.) His claim

was initially denied on December 22, 2010 (R. at 76–79.), and upon reconsideration on February

11, 2011. (R. at 81, 85.) On February 22, 2011, Plaintiff requested a hearing before an

Administrative Law Judge ("ALJ"). (R. at 88–89.) The hearing was held before Warnecke Miller

on November 16, 2011, in Fort Wayne, Indiana. (R. at 33.) On December 21, 2011, the ALJ

determined that Plaintiff was not disabled. (R. at 14–28.) Following the Appeals Council's denial

of Plaintiff's request for review on May 31, 2012, the ALJ's opinion became final. (R. at 1–3.)

**B.  Factual Background**

**(1) *Plaintiff's Background and Testimony***

     Plaintiff was born in 1965. (R. at 40.) He has a high school diploma and a Commercial Driver's License. (R. at 42.) For twenty-four years Plaintiff was employed as a truck driver. (R. at 42.) During his last fourteen years he hauled automotive parts, a job that required minimal physical activity or lifting. (R. at 42, 44.) In the fall of 2008, Plaintiff was placed on short-term disability for pain he experienced in his legs and hips. (R. at 44.) After taking time off for three to four months, he returned to work for two weeks before he was laid off. (R. at 45.) During the hearing, Plaintiff identified that his Commercial Driver's License was valid, but recognized that it would expire in 2012. (R. at 50.) He further acknowledged that he was uncomfortable driving because he feared that if his legs became numb he would be unable to stop the vehicle by braking. (R. at 50.)

     Plaintiff described pain primarily in his hips and legs, but also experienced headaches and migraines frequently. (R. at 45–46.) The pain in his legs  occurred four or five days a week and often would travel through his arms, hands and wrists. (R. at 46.) As of the hearing date, Plaintiff had spent the previous ten months in pain management where he received numerous narcotics including morphine, methadone, and OxyContin, among others; all of which, according to Plaintiff, failed to alleviate the pain. (R. at 51, 54.) The only time Plaintiff felt normal in the past three years was after he received two shots of morphine; yet, after the morphine wore off, the pain returned. (R. at 47.) Dr. Kachmann recommended and began the process of weaning Plaintiff off the narcotics and also suggested that Plaintiff engage in some form of exercise, such as walking for a half hour each day. (R. at 51.) In a further attempt to alleviate the pain, Plaintiff

received aquatic therapy, but stated that after completing ten out of the twelve prescribed sessions the final two sessions were suspended because the therapy was not helping. (R. at 58.)

At the hearing, Plaintiff identified that his overall pain level was consistently an eight out of ten, with ten signifying pain severe enough to warrant a visit to the emergency room. (R. at 54.) He testified that he could sit for about thirty minutes at the most, and stand for about twenty minutes at a time. (R. at 54.) A doctor prescribed him a cane two years ago; however, at times his hands would tense up preventing him from using the cane. (R. at 55). On average, this occurred about three to four times a week for two hours at a time. (R. at 56.) Plaintiff was also prescribed a walker that he used on average three times a month. (R. at 57.)

When discussing his physical limitations, Plaintiff testified that he has trouble reaching over his head, raising his arms forward to shoulder level, and grasping items. (R. at 57.) Further, he struggled to pick things up from the ground, squat, twist, bend, and also experienced difficulty walking up or down stairs. (R. at 58.) He identified that the pain in his arms had limited his ability to lift heavy items, such as a forty-pound bag of salt. (R. at 55.) However, he said that he could carry a gallon of milk with each arm. (R. at 55.)

As of the hearing date, Plaintiff's morning routine involved his wife packing his legs in ice before he could lift himself from bed. (R. at 46.) After about an hour and a half, Plaintiff claimed that his body was numb which permitted him to move to the kitchen for breakfast. (R. at 46.) Five hours after breakfast, he became exhausted and would again experience intense pain which required him to lie down. (R. at 46.) Plaintiff testified that he was most comfortable when lying down, and would lie down for three hours between 8 a.m. and 5 p.m. (R. at 59.) He believed he could not go through an eight hour day without lying down. (R. at 59.) During this time, he constantly elevated his legs which helped alleviate the strain on his hips. (R. at 59.) He

also said that he had difficulty completing simple tasks like showering, putting on clothes, or even sleeping. (R. at 59–60.)

### (2) *Medical Evidence*

In November 2008, Dr. Zurcher diagnosed Plaintiff with moderately severe chronic obstructive pulmonary disease ("COPD") (R. at 229–230.) Two months later, Dr. Harvey, Plaintiff's primary care physician, suggested that Plaintiff "may have fibromyalgia." (R. at 253.) On January, 28, 2009, an x-ray revealed "mild hypertrophic degenerative spur formation at several levels," but revealed "no evidence of significant disc space narrowing." (R. at 303.) In November, Plaintiff underwent further x-rays evidencing disc space narrowing at C5-C6. (R. at 297.) An MRI taken in December of Plaintiff's thoracic portion of the spine showed mild degenerative changes and a mild degree of spinal stenosis at T3-T4 and T11-T12, although there was no evidence of spinal cord compression or nerve root compression. (R. at 298.)

In June 2010, Dr. Hanus diagnosed Plaintiff with daily headaches and intermittent migraines. (R. at 273.) During a July follow up, Dr. Hanus noted Plaintiff experienced improvement with the headaches and diagnosed him with carpal pedal spasm, hyperventilation syndrome, "probably some fibromyalgia with intermittent daily headaches and migraines," thoracic pain, and hypertension. (R. at 274.) Three months later, Plaintiff visited Dr. David Campbell for a rheumatology consultation. (R. at 281.) Dr. Campbell recorded a positive straight leg raise at thirty degrees bilaterally and a normal straight leg raise on the left. (R. at 281.) Dr. Campbell concluded that he "[did] not currently find evidence of fibromyalgia [or] connective tissue disease." (R. at 281.)

Plaintiff met with Dr. Onamusi for an examination concerning his disability claim on November 18, 2010. Dr. Onamusi recorded that Plaintiff "walked with a short strided gait and

appeared to be slightly unsteady and in mild to moderate discomfort as he walked." (R. at 312.) According to Dr. Onamusi's report, Plaintiff could not squat, kneel, or stand on his heels or toes. (R. at 312.) It was Dr. Onamusi's impression that Plaintiff suffered from fibromyalgia with generalized muscle pain and fatigue and COPD with intermittent wheezing. (R. at 313.) Onamusi reasoned that "considering [Plaintiff]'s current clinical and functional status it [wa]s [his] opinion that [Plaintiff] may have difficult engaging successfully in gainful employment." (R. at 313.)

Dr. Sands, also a medical consultant for the Disability Determination Bureau, performed a physical Residual Functional Capacity ("RFC") assessment on November 30, 2010, and concluded that the claimant could occasionally lift ten pounds, frequently lift less than ten pounds, stand for at least two hours in an eight-hour work day, sit for six hours in an eight-hour work day, occasionally climb ramps or stairs, balance, or stoop, but could never climb ladders, ropes, or scaffolds, kneel, crouch, or crawl. (R. at 320–21.) Less than a month later, Plaintiff visited Dr. Harvey, a neurology specialist, who diagnosed him with chronic pain syndrome. (R. at 336.) In early January 2011, Dr. Karl diagnosed Plaintiff with "lumbar radiculitis not responding to conservative measures" and Plaintiff received an interlaminar lumbar epidural steroid injection at L5-S1. (R. at 354.) The following day, Dr. Harvey prescribed Plaintiff a cane and walker. (R. at 369–70.) After an additional injection failed to alleviate the pain, Plaintiff underwent an MRI of his lumbar spine which illustrated degenerative disc disease at L4-L5 and L5-S1. (R. at 372, 445.)

On March 15, 2011, Dr. Williams, an orthopedic surgeon, diagnosed Plaintiff with lumbar herniated/ruptured disc but noted that no acute changes or significant abnormalties were identified on the lumbar x-rays (R. at 429.) The following month, Plaintiff visited Dr. Song, who

recorded that Plaintiff likely suffered from chronic pain syndrome with a central disc extrusion at L4-5. (R. at 414.) On April 12, 2011, Plaintiff visited Dr. Karl for a follow-up examination. Dr. Karl documented a limited range of motion in Plaintiff's left arm and  legs, with a full range of motion in Plaintiff's right arm. (R. at 407.) However, Plaintiff's spine flexion, extension, and rotation were limited, he was experiencing cervical pain, and his right and left straight leg raise was positive which indicates a herniated disk. (R. at 407.)

Dr. Kachmann, a neurosurgeon, evaluated Plaintiff on August 18, 2011, and identified that Plaintiff was "hypersensitive to touch over the skin and musculature in the cervical, thoracic, and lumbar spine, consistent with fibromyalgia." (R. at 460.) Dr. Kachmann also noted that Plaintiff's motor, sensory, and reflex examination was normal. (R. at 460.) He concluded that Plaintiff suffered from "centralized cerebral" pain because the x-rays did not illustrate any problems connected to Plaintiff's pain. (R. at 461.) During an October follow-up examination, Dr. Kachmann diagnosed Plaintiff with chronic severe pain, severe fibromyalgia, migraine headaches, and anxiety and depression. (R. at 457.) In addition, Dr. Kachmann identified that Plaintiff was "50% limited on flexion, extension, and rotation of the cervical, thoracic, and lumbar spine . . . . [and] ha[d] hypersensitive muscles and skin." (R. at 457.) Dr. Kachmann identified "[Plaintiff] [wa]s clearly disabled. . . . [Plaintiff] clearly [could not] be reeducated for work and [Dr. Kachmann] d[id]n't think anyone would hire a person in such a terrible pain condition. [Plaintiff could not] do any bending or twisting. . . . [Also,] [h]e [could not] lift more than five pounds on a regular basis." (R. at 458.)

**(3) *Vocational Expert's Testimony***

Vocational expert Sharon Ringenberg ("VE") testified at Plaintiff's November 16, 2011, hearing before the ALJ. (R. at 62–68.) During the VE's testimony, the ALJ provided the VE with

6

three hypotheticals to evaluate, all of which included Plaintiff's age, high school education and prior work experience. (R. at 63–67.) The first scenario incorporated the limitations from the RFC assessment. (R. at 63–64.) The VE concluded that, under this factual scenario, Plaintiff could not perform his past relevant work. (R. at 64.) However, Plaintiff could complete sedentary, special vocational preparation two work, meaning work that requires up to a month for training. (R. at 64–65.) Examples of positions in northeast Indiana included charge-account clerks (3,000 existing jobs in Indiana), call-out operators (600 existing jobs in Indiana), and optical final assembler (300 existing jobs in Indiana). (R. at 64–65.)

For the second hypothetical, the ALJ added that the individual was unable to "understand, remember or carry out detailed instruction and could not tolerate sudden or unpredictable workplace changes." (R. at 65.) The VE concluded that Plaintiff could perform sedentary work with this limitation. (R. at 65.) The VE opined that under the second scenario the job of final assembler would remain and added the job of an addresser (300 existing jobs in Indiana) and telephone order clerk (1,000 existing jobs in Indiana). (R. at 65.)

Under the third factual scenario, the ALJ proposed a hypothetical corresponding with Plaintiff's subjective view of his pain and limitations, as described throughout the hearing. (R. at 42–61.) The ALJ added that the individual could bilaterally handle objects on an occasional basis, would need to elevate his legs to waist level several times daily, would need two, hour-long breaks each day, and would consistently require three or more unscheduled absences per month. (R. at 66.) The VE concluded that these circumstances would preclude all employment. (R. at 66.) First, the VE reasoned that elevating one's legs to waist level would be too high. (R. at 66.) Further, typical on-task requirements are around 80% to 85% of the work day, taking into consideration two fifteen-minute breaks, both morning and afternoon, and a half an hour lunch

break. (R. at 66–67.) Thus, two breaks of sixty minutes each amounted to too much time off-task. (R. at 67.) Finally, missing work one or two days a month is tolerated, but two or more days creates issues with maintaining competitive employment. (R. at 67.)

**(4)** *ALJ's Decision*

On December 21, 2011, the ALJ issued an unfavorable decision that Plaintiff was not disabled from January 30, 2009, through the date of the decision. (R. at 17.) The ALJ determined that Plaintiff suffered from multiple severe impairments: obesity; fibromyalgia; chronic obstructive pulmonary disease; lumbar degenerative disc disease; hypertension; centralized cerebral pain resulting from anxiety and depression; and adjustment disorder. (R. at 19.) Nevertheless, the ALJ concluded that these impairments did not meet any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20.)

Further, the ALJ found that the claimant had not engaged in any substantial gainful activity since the alleged onset date (R. at 19), and was unable to perform any past relevant work (R. at 26). However, the ALJ concluded that in considering Plaintiff's age, education, work experience, and residual functional capacity, there were other jobs that existed in significant numbers that Plaintiff could perform. (R. at 27.)

**C. Standard of Review for Disability Insurance Benefits Claim**

Under 42 U.S.C. § 405(g), this Court has the authority to review Social Security Act claim decisions. 40 U.S.C. § 405(g) (2006). The Court will uphold an ALJ's decision if it is reached under the correct legal standard and supported by substantial evidence. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971). This Court will not reconsider facts, re-weight the evidence, resolve conflicts in the evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005). However, this Court will assess whether the ALJ built an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may access the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).

## D.  Disability Standard

To qualify for DBI benefits, a claimant must prove that he suffers from a disability. A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). The Social Security regulations set forth a five-step test used to assess whether a claimant qualifies for disability benefits. Pursuant to these regulations, a claimant must establish:

> (1) he is not presently employed; (2) his impairment is severe; (3) his impairment is listed or equal to a listing in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) he is not able to perform his past relevant work; and (5) he is unable to perform any other work within the national and local economy.

*Scheck v. Barnhart*, 357 F.3d 697, 699–700 (7th Cir. 2004).

An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant

is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

**E.   Analysis**

Plaintiff contends that the Commissioner's decision is not based on substantial evidence as required under 42 U.S.C. § 405(g). Plaintiff asserts that the ALJ committed four legal errors: (1) the ALJ failed to adequately consider whether the Plaintiff's impairments met or medically equaled Listing 1.04; (2)the ALJ failed to give adequate weight to Plaintiff's primary physician; (3) the ALJ erred in his assessment of Plaintiff's RFC; and (4) the ALJ erred in his assessment of Plaintiff's credibility.

**(1) *The ALJ's decision that Plaintiff did not meet or medically equal Listing 1.04 is supported by substantial evidence.***

Plaintiff contends that the ALJ failed to adequately consider whether Plaintiff's impairments met or medically equaled Listing 1.04. As to this listing, the ALJ stated

> [t]he claimant's degenerative disc disease was evaluated under Listing 1.04 (disorders of the spine). The evidence does not establish the presence of nerve root compression, spinal arachnoiditis, or spinal stenosis resulting in pseudoclaudication, as required by that listing.

(R. at 20.) The Court finds that the ALJ's statement that the evidence does not meet the requirements under Listing 1.04 was supported by substantial evidence throughout the ALJ's opinion and although the ALJ discussion was cursory, such error does not warrant remand.

At the outset, Plaintiff bears the burden of proving all the required listing level findings. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). Under the regulations, Plaintiff must establish that *all* of the criteria within a listing were satisfied concurrently for 12 months. 20 C.F.R. §§ 404.1509. In analyzing a specific listing, an ALJ should mention the particular listings

10

considered and failure to do so, if coupled with a perfunctory analysis, may necessitate remanding the case. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). The ALJ is not required to divulge every piece of evidence in the record that supports a listing. *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). "[T]he ALJ may rely solely on opinions given in Disability Determination and Transmittal forms and provide little additional explanation only so long as there is no contradictory evidence in the record." *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006). Remand is not appropriate if the evidence Plaintiff contends the ALJ ignored or misstated does not establish a disability under the listing. *See Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002).

In support of his conclusion, the ALJ stated that he relied upon the findings of "the medical consultants who reviewed the case at the initial and reconsideration levels," Dr. Sands and Montoya, both of whom concluded that Plaintiff did not meet or medically equal any listing impairment. (R. at 20.) Further, the ALJ's determination specifically referenced Listing 1.04. (R. at 20.) Although the ALJ's analysis was cursory, little more was required since Plaintiff clearly did not meet the listing requirement for a period of 12 months, and Plaintiff failed to point to any medical opinion concluding that Plaintiff met or medically equaled Listing 1.04. *See Whalen v. Astrue*, 630 F. Supp. 2d 940, 949 (N.D. Ill. 2009). In other words, although the ALJ provided a cursory assessment of the evidence favorable to [Plaintiff], the record is devoid of evidence that would prove plaintiff satisfied all of the criteria under Listing 1.04 concurrently for 12 months. 20 C.F.R. §§ 404.1509.

Listing 1.04A requires evidence of "nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if

there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20
C.F.R. Part 404, Subpart P, App. 1, 1.04A. In support of this listing, Plaintiff identifies that as
early as December 14, 2009, an MRI revealed that Plaintiff's thoracic spine demonstrated a mild
degree of spinal stenosis; however, there was no evidence of nerve root compression as required
under Listing 1.04. (R. at 298.) Further, in October 2010, Dr. Campbell recorded a positive
straight leg raise at only thirty degrees. (R. at 281.) Even Dr. Onamusis, who examined Plaintiff
concerning his disability claim, recognized that Plaintiff was unable to squat, kneel, or stand on
his heels or toes. (R. at 312.) An inability to squat or walk on the toes or heels can provide
evidence of significant motor loss, as required under Listing 1.04A. 20 C.F.R. Part 404, Subpart
P, App. 1, 1.00E1. However, all of the evidence brought forth by Plaintiff fails to meet or
medically equally Listing 1.04A because Plaintiff did not prove or point to evidence in the record
showing that *all* of the criteria under Listing 1.04A was satisfied concurrently for 12 months.

　　Plaintiff also contends that the ALJ failed to consider whether he met or medically
equaled listing 1.04C. Listing 1.04C pertains to "[l]umbar spinal stenosis resulting in
pseudoclaudication, established by findings on appropriate medically acceptable imaging,
manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate
effectively . . . ." 20 C.F.R. Part 404, Subpart P, App. 1, 1.04C. Ineffective ambulation is defined
as "generally [ ] having insufficient lower extremity functioning . . . to permit independent
ambulation without the use of a hand-held assistive device(s) that limits the functioning of *both
upper extremities*." 20 C.F.R. Part 404, Subpart P, App. 1, 1.00B2b(1). Examples include, among
others, the inability to walk without using a walker or the inability to walk without using two
crutches or canes. 20 C.F.R. Part 404, Subpart P, App. 1., 1.00B2b(2). The record identifies that
Plaintiff requires the use of a cane when walking or standing, but this cane does not restrict the

use of both of Plaintiff's upper arms as defined in the regulations. Plaintiff contends that he was prescribed a walker for ambulation, but admitted during his testimony that he uses the walker "once a week" and sometimes "more often than that." (R. at 57.) Regardless, Plaintiff's use of a walker once a week would not meet the requirement of Listing 1.04C because the criteria thereunder was not satisfied for a concurrent period of 12 months. 20 C.F.R. §§ 404.1509

Although Plaintiff contends that the ALJ's failure to consider any evidence was in error, the Court cannot agree. The record is lacking in evidence that proves Plaintiff met or medically equaled any of the Listing 1.04 criteria concurrently for 12 months, and the Court finds that the ALJ's statement rejecting that Plaintiff satisfied Listing 1.04 was supported by substantial evidence throughout the record and although the ALJ's discussion was cursory, such error does not warrant remand.

**(2) *The ALJ's decision considering the weight to afford each medical opinion was supported by substantial evidence.***

Plaintiff claims the ALJ erred in his assessment of Plaintiff's RFC because he failed to give controlling weight to treating physician Dr. Kachman, improperly gave great weight to State agency reviewing physicians, and failed to properly consider the opinions of other physicians. The Court finds the ALJ provided substantial justification for his decision.

An ALJ must afford a treating doctor's opinion controlling weight if it is well-supported and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and

supportability of the physician's opinion." *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *see also* 20 C.F.R. § 404.1527(c)(2).

Plaintiff contends that the ALJ erred by providing deficient reasons for not granting controlling weight to Dr. Kachmann's medical opinion. However, the ALJ provided numerous reasons as to why Dr. Kachmann's opinion was inconsistent with other evidence and thus not entitled to controlling weight. The ALJ opined that Dr. Kachmann's medical evaluations from August 2011 and October 2011 "read differently." (R. at 24.) The ALJ pointed out that in August 2011, Dr. Kachmann attributed Plaintiff's condition to "centralized cerebral pain" because the x-rays failed to illustrate any issues connected to Plaintiff's pain. (R. at 461.) Dr. Kachmann noted that Plaintiff's motor, sensory, and reflex examination was normal, diagnosed Plaintiff with generalized fibromyalgia, anxiety, and mild depression, and encouraged him to exercise and to read books relating to "centralized cerebral pain." (R. at 461.) Two months later, during Plaintiff's follow up examination, Dr. Kachmann recognized that Plaintiff applied for Social Security Disability and in direct contradiction to his August assessment opined that "[Plaintiff] [wa]s clearly disabled. . . . [could not] be reeducated for work and [Dr. Kachmann] d[id]n't think anyone would hire a person in such a terrible pain condition. [Plaintiff could not] do any bending or twisting. . . . [or] lift more than five pounds on a regular basis." (R. at 458.)

The ALJ concluded that Dr. Kachmann's August and October assessments directly contradicted one another and provided substantial evidence as to why Dr. Kachmann's opinion was not given controlling weight. First, the ALJ recognized that Dr. Kachmann's encouragement that Plaintiff exercise indicated some level of physical functionality in August, although he later claimed in October that Plaintiff was "clearly disabled." (R. at 458.) Even if this statement was not directly contradictory, Dr.

Kachmann's assessment of Plaintiff as "clearly disabled" is an opinion on an issue that is reserved for the ALJ and thus not afforded controlling weight. *See* 20 C.F.R. § 404.1527(d)(1). Second, during the August assessment Dr. Kachmann encouraged plaintiff to read books relating to his "centralized cerebral pain," but then two months later claimed Plaintiff "clearly cannot be re-educated for work." (R. at 458, 461.) Last, the ALJ identified that Dr. Kachmann's statement concerning hiring practices of someone in terrible pain, falls outside of Dr. Kachmann's neurological expertise and thus, the ALJ accorded Dr. Kachmann's opinion limited weight. Nevertheless, the ALJ adopted Dr. Kachmann's assessment that Plaintiff could not lift more than five pounds on a regular basis, which was adopted in the ALJ's RFC and which was consistent with the ALJ's determination that Plaintiff may perform sedentary work. (R. at 458.)

As an alternative argument, Plaintiff claims that even if Dr. Kachmann's opinion deserved limited weight, the ALJ failed to consider the "length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Scott*, 647 F.3d at 740; *see also* 20 C.F.R. § 404.1527(c)(2). The Court disagrees with this argument. First, although the ALJ did not specifically identify each of these factors and provide his assessment, throughout his analysis of weight afforded to Dr. Kachmann's opinion, the ALJ referenced many of these factors. For instance, the ALJ pointed out that Dr. Kachmann was a neurologist, that August 2011 and October 2011 were the only times Plaintiff visited Dr. Kachmann, and also discussed the consistency and supportability of Dr. Kachmann's opinion. Thus, the Court cannot agree with Plaintiff that these factors were not adequately considered by the ALJ.

Plaintiff also contends that the ALJ erred by failing to properly weigh and explain the rationale for rejecting the consultative examiner's opinion that the claimant could not properly sustain work activity. (Pl.'s Br. 23.) Again, the Court finds that this is an issue reserved to the ALJ because it pertains to whether Plaintiff meets the statutory definition of disability. *See* 20 C.F.R. § 404.1527(d)(1). As such, the ALJ's determination that this assessment received "limited weight" was proper.

Last, Plaintiff argues that the ALJ erred by relying on the state agency consultant's opinion for the RFC findings without evaluating it within the regulatory factors. In weighing medical opinions, the Court must evaluate each medical opinion and consider the examining relationship, the treatment relationship, supportability, consistency, specialization, and other factors. 20 C.F.R. § 404.1527(c). "[The Court] generally give[s] more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527. Further, "[u]nless a treating source's opinion is given controlling weight, the [ALJ] must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialists . . . ." 20 C.F.R. § 404.1527(e)(2)(ii).

First, state agency medical consultants are experts in the Social Security disability programs." SSR 96-6p. However, the above-mentioned factors are general in nature and identify only that an ALJ should "consider" the factors with regard to any medical opinion. These factors are distinct from the factors that consider whether a treating physician's opinion receives controlling weight. The regulations used to assess the weight to accord a treating physician's opinion requires an ALJ "[to] always give good reasons .

16

. . for the weight give[n] [a] treating source's opinion." 20 C.F.R. § 404.1527(c)(2). Yet, the regulations assessing an opinion of a non-examining source only state that the ALJ must "explain in the decision the weight given to the opinion[ ] . . . "

The Court finds that the ALJ sufficiently explained in his decision the weight afforded to the non-examining sources. Here the ALJ gave "significant weight" to the State agency's opinion when considered in conjunction with Dr. Kachmann's symptoms relating to "centralized cerebral pain." (R. at 25.) This evidences that the ALJ considered the supportability and consistency of the non-examining sources. Further, the ALJ found that the characterization of "centralized cerebral pain" best aligned with the record as a whole, and afforded limited weight to the State agency's psychologists determination because the record illustrated more limitations than assessed by the state psychologists. (R. at 26.) Again, this supports that the ALJ considered the supportability and consistency of the state agency opinions with the record. Thus, in accordance with the regulations, the ALJ correctly identified the weight afforded to the state agency's opinion. *See* 20 C.F.R. § 404.1527(e)(2)(ii).

The Court finds the ALJ's assessment of the amount of weight afforded to the state agency physicians and psychologists sufficiently satisfies the burden that the ALJ consider the regulatory factors. Further, the Court concludes that the ALJ's assessment of weight afforded to each physician's opinion is supported by substantial evidence.

**(3) *The ALJ did not err in his assessment of Plaintiff's RFC.***

Plaintiff points to various medical diagnoses and observations and claims that the ALJ "ignored objective medical evidence demonstrating that [Plaintiff] lacked the exertional capacity to sustain even the modest exertional demands of sedentary work." (Pl.'s Br. 25.) Plaintiff

contends that the ALJ failed to build an accurate and logical bridge between the ALJ's conclusion and the evidence. The Court cannot agree with Plaintiff's contention and instead finds that the ALJ's RFC assessment is supported by substantial evidence.

Under the regulations, an ALJ must evaluate the medical evidence, resolve conflicts and determine a claimant's RFC. 20 C.F.R. §§ 404.1527, 416.927. In doing so, an ALJ must base the RFC determination "on all of the relevant evidence in the case record, including . . . the individual's symptoms and any . . . opinions about what the individual can still do despite his or her impairment(s) [that were] submitted by an individual's treating source or other acceptable medical sources." SSR 96-8p. An ALJ must "confront evidence that does not support his conclusion and explain why it was rejected." *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2002). However, "[t]he ALJ need not provide a written evaluation of every piece of evidence, but need only 'minimally articulate' his reasoning so as to connect the evidence to his conclusions." *Knox v. Astrue*, 327 Fed. App'x 652, 657–658 (7th Cir. 2009).

Plaintiff claims the ALJ ignored evidence of Plaintiff's subjective symptoms, ignored his need for a walker, and ignored his testimony concerning difficulty raising his arms above shoulder level. At the outset, the ALJ began by discussing Plaintiff's testimony and the pain allegedly experienced in his legs, hips and back. (R. at 22.) The ALJ also noted Plaintiffs "difficulty using his arms and hands due to pain and numbness" and his "limited ability to lift and walk." Although not discussed in as much detail as Plaintiff may desire, these statements support the Court's finding that the ALJ adequately considered Plaintiff's subjective symptoms, need for a walker, and difficulty with raising his arms. Further, as mentioned above, the ALJ was not required to provide a written evaluation of each piece of evidence in the record. *See Knox*,

327 Fed. App'x at 657–658. Thus, the Court concludes that the ALJ's did not legally err in his assessment of Plaintiff's RFC.

**(4)** ***The ALJ's determination that the Plaintiff was not credible is not patently wrong.***

Last, Plaintiff asserts that the ALJ legally erred by improperly dismissing Plaintiff's testimony concerning his musculoskeletal pain and difficulty walking. Because the Court finds that substantial evidence supports the ALJ's credibility determination, the Court affirms the ALJ's findings.

The Seventh Circuit has recognized that "[b]ecause the ALJ is in the best position to observe witnesses, we will not disturb h[is] credibility determinations as long as they find some support in the record." *Dixon v. Massanari*, 270 F.3d 1171, 1178–79 (7th Cir. 2001). The Court will reverse an ALJ's credibility determination only if Plaintiff establishes it was "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). "Patently wrong" is a high burden. *Turner v. Astrue*, 390 Fed. App'x. 581, 587 (7th Cir. 2010). "An ALJ's credibility determination need not be flawless." *Adams v. Astrue*, 880 F. Supp. 2d 895, 905 (N.D. Ill. 2012) (citing *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2008)). Only when an ALJ's determination lacks any support or explanation will the Court declare it "patently wrong," so as to require reversal. *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008) (citations omitted). Thus, only if the ALJ grounds his credibility determination in an unreasonable argument or observation will the credibility finding be reversed. *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006).

Here the ALJ determined that Plaintiff had the RFC to perform a restricted range of unskilled sedentary work. (R. at 26.) After discussing that Dr. Kachmann's findings of "centralized cerebral pain" aligned with the record as a whole, the ALJ summarized his credibility findings as follows:

19

> [I]t should be noted that giving credit to th[e] [psychological] analysis does not
> provide [Plaintiff] with a finding of full credibility for all of his symptomatic
> complaints. Instead, it provides a diagnosed explanation for his symptomatic
> complaints, but the severity of the issue is still based on the medical record as a
> whole and a credibility analysis. This analysis finds that the claimant is not fully
> credible for the extent of pain and its impact on functionality. Reasonable weight
> has been given to the claimant and his residual functional capacity in this case
> reflects the functional abilities supported by the record as a whole.

(R. at 26.)

The issue is whether the ALJ supported this statement with an explanation and sufficient evidence from the record, and the Court finds that he provided sufficient evidence as to why the Plaintiff's testimony was not credible. Most convincing, the ALJ recognized various discrepancies between the record and Plaintiff's testimony. First, Plaintiff was laid off as a truck driver because of lack of work, as opposed to the alleged disabling impairments. (R. at 22.) Second, Plaintiff testified he could sit for probably 30 minutes at most, but then sat for over 40 minutes at the hearing and sat for an hour during his psychological examination. (R. at 22.) The ALJ also noted that during his testimony, Plaintiff exhibited "no pain-related behaviors, was not shifting in his seat, and provided competent and relevant testimony in a calm and rational manner." (R. at 22–23.)

Each of the above-mentioned reasons supports the ALJ's finding concerning Plaintiff's credibility as it relates to the intensity, persistence and limiting impact of Plaintiff's symptoms. Thus, the Court finds the ALJ's decision concerning credibility is supported by substantial evidence.

**F.  Conclusion**

The Court finds that the ALJ adequately considered whether Plaintiff's impairments met or medically equaled Listing 1.04, the ALJ gave appropriate weight to Plaintiff's primary

physician, the ALJ did not err in his assessment of the RFC, and the ALJ also did not err in his determination of Plaintiff's credibility.

The Court affirms.

SO ORDERED on September 27, 2013.

 S/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE